**Mary KELLY, Administratrix, Plaintiff,**

v.

**Dr. P. WEHRUM, et al., Defendants.**

**No. C:2–95–CV–730.**

United States District Court,
S.D. Ohio,
Eastern Division.

March 10, 1997.

Theresa Cunningham, Cincinnati, OH, for plaintiff.

Basis J. Musnuff, Ohio Attorney General, Cleveland, OH, Janet R. Hill Arbogast, Ohio Attorney General, Corrections Litigation, Columbus, OH, for defendant.

## OPINION AND ORDER

SARGUS, District Judge.

Plaintiff Mary Kelly ["plaintiff"], the mother and administratrix of the estate of Ernest Davis ["decedent"], who was incarcerated at the Ross Correctional Institution ["RCI"] from November 1992 to June 1993, brings this civil rights action under 42 U.S.C. §§ 1983 and 1988, alleging that defendants were deliberately indifferent to decedent's serious medical needs. Named as defendants are Dr. Paul Wehrum, the physician and medical director at RCI during the en-

tire period of the decedent's incarceration at RCI; Betty Kelly, formerly employed at RCI as a registered nurse; and Michelle Stobart, a licensed practical nurse employed at RCI. This matter is before the Court on defendants' motions for summary judgment.

## Background

Much of the factual background is not in dispute. The decedent entered the Ohio correctional system is September 1992. The decedent had a history of asthma, and that condition was noted in the decedent's medical records when he was transferred to RC. When the decedent first arrived at RCI in November 1992, he was interviewed by defendant Stobart, who recorded that the decedent had been using a proventil inhaler to treat his asthma. (Stobart Depo. Tr. at 12). Defendant Wehrum prescribed a proventil inhaler to take four times a day, and that prescription was renewed periodically until June 3, 1993, when defendant Wehrum prescribed a maxaire inhaler.

While at RCI, the decedent worked in the prison kitchen. The decedent complained that the steam in the kitchen adversely affected his asthma. Defendant Wehrum recommended to prison officials that they remove him from kitchen duty, but that apparently did not occur.

This action primarily concerns the events of Saturday, June 12, 1993. On that day, the decedent reported to inmate health services ["IHS"] at RCI stating that he was suffering an asthma attack. Defendant Wehrum, the only doctor on staff at that time, was out of town for the weekend. Defendant Stobart had been on duty at that time, and she testified at her deposition that she had contacted defendant Wehrum by telephone shortly after the decedent had arrived. (Stobart Depo. Tr. at 19). Stobart further testified that, pursuant to instructions from defendant Wehrum, she had administered medication to the decedent at 4:30 pm, 5:15 pm, and 6:00 pm. According to defendant Stobart, the 4:30 medication was bronkesol, an aerosol treatment, and the 5:15 and 6:00 pm medications were bronkosphrine subcutaneous injections. (Stobart Depo. Tr. at 16, 19).

Medical documents recorded on that date reflect that two forms of bronchodilator and a corticosteroid were prescribed. Plaintiff contends that RCI officials should done have more, and suggests that the proper course would have been to transport the decedent to the hospital where, according to plaintiff, medical personnel would have treated the decedent every twenty minutes and would have continually monitored his vital signs.

The complaint alleges that officials, presumably meaning defendant Stobart, failed to monitor his vital signs or to take other action to determine the effectiveness of the medication. Defendant Stobart testified that she had no specific recollection of taking vital signs, but that generally her practice is to take a pulse and listen to the lungs after a bronkosphrine treatment. (Stobart Depo. Tr. at 17).

According to Stobart, the decedent thereafter rested and/or slept in the IHS ward. She periodically observed him sleeping, but did not monitor his breathing or pulse. (Stobart Depo. Tr. at 23–24). The decedent was not transferred to a hospital for treatment, and there is no indication that any official at RCI considered such a move at any time in the four hour period after the decedent first appeared at IHS complaining of an asthma attack.

Defendant Kelly arrived on duty at approximately 8:00 pm, joining defendant Stobart. At approximately 8:45 pm, defendant Stobart discovered the decedent at a nurse's desk in the ward "unable to walk and unable to breathe without severe difficulty." (Stobart Depo. Tr. at 24). The decedent apparently had gone into respiratory arrest. Defendants Stobart and Kelly administered two injections of bronkosphrine. Defendant Stobart admitted at her deposition that defendant had not authorized her to administer that round of bronkosphrine, but stated that, in light of the emergency nature of the situation, she had felt compelled to exercise her own judgment to try to open the decedent's airway. (Stobart's Depo. Tr. at 28).

Within a few minutes, the decedent collapsed and lost consciousness. Defendants Stobart and Kelly immediately performed CPR, and administered an injection of epi-

nephrine, and then a steroid known as solmedrol. Defendant Stobart testified that she had not called defendant Wehrum after the decedent went into respiratory arrest because there was no time to do so. (Stobart Depo. Tr. at 26). Paramedics then arrived, and found the decedent with no airway, a pulse of zero, and a respiration of zero. The decedent was declared dead at approximately 10:15 pm.

The complaint seeks monetary damages and attorney's fees.

### Standard of Review

The procedure for granting summary judgment is found in Fed.R.Civ.P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). But summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson,* 477 U.S. at 251, 106 S.Ct. at 2511–12.

### Discussion

#### *Injury to Plaintiff*

█ Defendants assert that plaintiff cannot recover under § 1983 for injury to her-self resulting from the death of her son. In particular, plaintiff seeks damages for loss of companionship.

In *Purnell v. City of Akron,* 925 F.2d 941 (6th Cir.1991), the administrator of an estate brought a survival action based upon alleged violations of the decedent's constitutional rights. The Court declined to rule on whether children could state a claim for damages under section 1983 based upon the killing of their father. *Purnell,* 925 F.2d at 948 n. 6. The Court, while recognizing that "a number of circuit courts have concluded that a decedent's immediate family may bring a section 1983 claim for deprivation of the parent-child relationship in the wrongful death context," noted that "section 1983 provides a cause of action which is personal [only] to the injured party." *Id.* (citing *Jaco v. Bloechle,* 739 F.2d 239, 241 (6th Cir.1984) ("By its own terminology, the statute grants the cause of action 'to the party injured.' "))

In *Gravely v. Madden,* Case No. C2–95–CV–006, slip op. —— F.Supp. —— [1995 WL 918085] (S.D.Ohio Sep. 8, 1995) (Holschuh, J.) (attached as exhibit G to *Defendants Stobart's and Kelly's Motion for Summary Judgment* (Jan. 6, 1997)), the Court noted that "[t]he Sixth Circuit has specifically reserved decision on whether members of a decedent's immediate family may bring a § 1983 claim for deprivation of the parent-child relationship in the wrongful death context." *Gravely,* slip op. At 9 (citing *Purnell, supra* ). Nevertheless, after reviewing the relevant case law, the Court held "that a loss of companionship claim by the parent of a child who has suffered a constitutional deprivation is not cognizable under § 1983." *Gravely,* at 10.

Plaintiff contends that *Gravely* is currently on appeal and is an "incorrect decision." *Plaintiff's Memorandum Contra Defendants' Motion for Summary Judgment,* at 25 (Jan. 30, 1997). However, with respect to this issue, *Gravely* is both well-reasoned and is well-grounded in Sixth Circuit authority. Moreover, the Court is inclined to follow Judge Holschuh's holding in *Gravely* in the interest of "intra-court comity." *See Fricker v. Town of Foster,* 596 F.Supp. 1353, 1356 (D.R.I.1984) ("absent unusual or exceptional

circumstances, judges of coordinate jurisdiction within a jurisdiction should follow brethren judges' rulings"); *but see Hastings Building Products. Inc. v. Nat'l Aluminum Corp.,* 815 F.Supp. 228 (W.D.Mich.1993) (quoting *Colby v. J.C. Penney Co., Inc.,* 811 F.2d 1119, 1124 (7th Cir.1987) ("The reasons we gave for giving some though not controlling weight to decisions of other federal courts of appeals do not apply to decisions of other district courts, because the responsibility for maintaining the law's uniformity is a responsibility of appellate rather than trial judges....")

Under 42 U.S.C. § 1988(a),[1] state law provides the procedural framework for § 1983 claims, so long as such procedures do not defeat the underlying purposes and policies of federal law. Ohio law does not permit a relative of a decedent to file separate claims for loss of companionship, support, etc. Instead, under Ohio Rev.Code § 2125.01 *et seq.,*[2] such claims may be asserted by the estate of the decedent in a wrongful death action. As noted by the Ohio Supreme Court in *Thompson v. Wing,* 70 Ohio St.3d 176, 179, 637 N.E.2d 917 (1994):

> [W]hen a person is injured by the tortious conduct of another and the person later dies from the injury, two claims arise. The first is a claim for malpractice or personal injury, enforced either by the injured person herself or by her representative in a survival action. The second is a wrongful death claim, enforced by the de-

cedent's personal representative on behalf of the decedent's beneficiaries.

*Thompson,* at 179, 637 N.E.2d 917.

The status of the plaintiff was the basis for the decision in *Gravely.* No claim under § 1983 survives as to a relative's loss of companionship resulting from the death of the decedent. The § 1983 claims of the decedent's estate, however, do not extinguish or abate upon his death, lest the purposes of the statute are completely ignored. Such claims include *both* the wrongful death action on behalf of the decedent's survivors *and* the claim on behalf of the estate for the injury to the decedent *during his lifetime.*

This conclusion is also the only interpretation of § 1983 which is consistent with the primary purpose of the statute. The precursor of § 1983, the Ku Klux Klan Act of 1871, was described during the floor debate in Congress by Representative Butler "as a remedy for wrongs, arsons and murders done. This is what we offer to a man whose house has been burned, as a remedy; to a woman whose husband has been murdered, as a remedy; to the children whose father has been killed, as a remedy." *Purnell,* 925 F.2d at 949 n. 6 (quoting Cong. Globe, 42d Cong., 1st Sess. 807 (1871)). To hold that a person who commits an unconstitutional act under the authority of state law directly causing the death of another may not be sued under § 1983 solely because the wronged party is now dead would emasculate the statute.

Accordingly, defendants' motions for summary judgment, as it relates to plaintiff's

---

1. 42 U.S.C. § 1988(a), which governs the applicability of statutory and common law, provides in pertinent part:

   The jurisdiction in civil ... matters conferred on the district courts ... for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitu-

   tion and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause....

2. Ohio Rev.Code § 2125.01, which governs wrongful death actions under Ohio law, provides in pertinent part:

   (A)(1) [I]f the death of a person is caused by wrongful act, neglect, or default that would have entitled the injured person to maintain a civil action and recover damages if death had not ensued, the person who would have been liable if death had not ensued or the administrator or executor of the estate of the liable person as that administrator or executor is liable in damages in an action for wrongful death under this chapter, notwithstanding the death of the injured person....

*personal* claims for damages under § 1983, is meritorious. Plaintiff may therefore seek relief only in her capacity as administratrix, asserting a claim on behalf of the decedent for personal injury and a claim for wrongful death on behalf of the beneficiaries.

### Legal Standard under § 1983 for Challenges to Medical Treatment

The Eighth Amendment proscription against cruel and unusual punishment includes deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976). Such indifference constitutes unnecessary and wanton infliction of pain. *Id.* Deliberate indifference does not include mere negligence in diagnosing or treating a medical condition. *Westlake v. Lucas,* 537 F.2d 857, 860 n. 5 (6th Cir.1976). Medical malpractice alone is insufficient to establish liability. *Durham v. Nu'Man,* 97 F.3d 862, 868 (6th Cir.1996). Rather, the defendants' conduct "must demonstrate deliberateness tantamount to intent to punish." *Horn by Parks v. Madison County Fiscal Court,* 22 F.3d 653, 660 (6th Cir.), *cert. denied,* 513 U.S. 873, 115 S.Ct. 199, 130 L.Ed.2d 130 (1994). Thus, prison officials "who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844, 114 S.Ct. 1970, 1982–83, 128 L.Ed.2d 811 (1994).

### Expert Witnesses

Plaintiff's expert witness, Kenneth B. Newman, M.D., an associate professor of medicine at the University of Cincinnati and the director for the Center of Asthma and Sinus Disorders, opines that the "management of Davis' asthma was totally inadequate, and was the predisposing factor leading to his fatal asthma attack." Newman Report, at 1 (attached as exhibit 1 to *Plaintiff's Motion to Cancel Mediation* (Dec. 6, 1996)). Dr. Newman attributes the inadequate medical care to lack of proper medical documentation and inappropriate drug prescriptions. Dr. Newman primarily directs his attention to the care provided to the decedent on the day of his death:

On the day of his fatal attack, Mr. Davis received care which I believe directly contributed to his death.... [T]his case represents medical conduct which is not just below the standard of care, but constitutes appalling malpractice. Not even the most basic and elementary medical interventions were performed, such as examining the patient and taking vital signs.

Newman Report, at 1–2.

Defendants' expert witness, David Rosenberg, M.D., issued a report stating that he had reviewed the medical records, incident report, and the report of Dr. Newman. Dr. Rosenberg "agree[d] with Dr. Newman that the objective measurements of asthma severity are lacking in the records and corticosteroids should have been administered early on during his treatment course." Rosenberg Report, at 3 (attached as exhibit H to *Defendants Stobart and Kelly Motion for Summary Judgment* (Jan. 6, 1997)). However, Dr. Rosenberg found that the "medical staff at [RCI] was attentive to Mr. Davis's status," and that "adequate historical information with respect to Mr. Davis' medical condition was recorded." Rosenberg Report, at 3. Dr. Rosenberg concludes that "The records clearly indicate that the medical staff at [RCI] was quite attentive to Mr. Davis' needs and he was evaluated promptly when his condition flared. He was not neglected. Unfortunately, he failed to respond to the medical treatment and expired." Rosenberg Report, at 3.

The record reflects, and defendants do not seriously dispute, that the medical needs of the decedent's asthmatic condition on June 12 were serious. Upon review of the reports of Dr. Newman and Dr. Rosenberg together, the Court concludes that there is a genuine issue of material fact regarding whether medical officials at RCI were deliberately indifferent to those needs. Accordingly, the Court must turn to a consideration of the culpability of each individual defendant.

### Defendant Wehrum

■ Respondeat Superior is not available as a basis for liability under § 1983. *Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir.), *cert. denied,* 469 U.S. 845, 105 S.Ct. 156, 83

L.Ed.2d 93 (1984). To the extent that plaintiff seeks to establish liability against defendant Wehrum in his supervisory capacity, he must therefore plead and prove that defendant Wehrum is personally liable for the constitutional deprivation. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A supervisor can be liable for an employee's violation of the plaintiff's constitutional rights if the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Hays v. Jefferson County,* 668 F.2d 869, 874 (6th Cir.), *cert. denied,* 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982).

■ Plaintiff asserts that defendant Wehrum was deliberately indifferent to the decedent's medical condition during the time that the decedent was incarcerated at RCI prior to the date of his death. Plaintiff contends, for example, that defendant Wehrum failed to prepare an adequate medical history of the decedent necessary to properly treat his asthma. Dr. Newman, in challenging the medical treatment of the decedent, noted that "There is no history taken of symptoms, patterns of disease, precipitating factors, typical attacks, allergies or prior therapy." Dr. Newman stated that a officials should have taken a history when the decedent first arrived at the infirmary in order to properly evaluate the severity of his condition. (Newman Depo. Tr. at 11).

Defendant Wehrum avers that the decedent infrequently sought medical attention regarding his asthma during his time of incarceration at RCI. *Affidavit of Paul A. Wehrum, D.O.,* ¶ 7 (attached as exhibit 1 to *Defendant Wehrum's Motion for Summary Judgment* (Jan. 6, 1997)). Defendant Wehrum further avers that, prior to the date of his death the decedent had never reported suffering an asthma attack. *Wehrum Affidavit,* ¶ 8. There is no evidence to contradict those averments. Moreover, it is undisputed that officials took a health history of the decedent on September 10, 1992. (Newman Depo. at 12). The fact that such history may not have been as comprehensive as Dr. Newman would have liked is not indicative of deliberate indifference. Defendant Weh-

rum's motion for summary judgment, as it relates to his conduct or lack thereof prior to the decedent's asthma attack on June 12, 1993, is therefore meritorious.

■ Plaintiff also seeks to attach liability to defendant Wehrum on the basis of his conduct on the date of the decedent's death. The record reflects that defendant Wehrum was out of town, but that defendant Stobart contacted him by telephone at some time on that date. The record is not clear regarding the time that she reached him. Defendant Wehrum contends that he was not reached until after the EMS unit arrived after 8:45 pm. Defendant Stobart, however, testified that, according to her records, she reached him at 4:30 pm, and that at that time he had prescribed bronkesol to be followed by two injections of bronkosphrine if the bronkesol treatment proved to be ineffective. (Stobart Depo. Tr. at 16–20).

If defendant Wehrum was not reached until after the decedent went into respiratory arrest, plaintiff's own expert has testified that there was nothing that he could have done. Because liability under § 1983 must be personal to the defendant, *see Monell,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611, defendant Wehrum is necessary not liable not liable for damages occurring on June 12 before he became aware of the decedent's asthma attack. On the other hand, if defendant Wehrum became aware of the attack at approximately 4:30 pm, as defendant Stobart contends, he may be subject to liability for failing to instruct defendant Stobart to have the decedent transported to a hospital, or at the very least, to order that steroids be administered immediately. Dr. Newman vigorously contends, and Dr. Rosenberg agrees, that steroids should have been administered immediately after the decedent had reported having the asthma attack at 4:30 pm.

The dispute as to when the telephone contact was made is therefore material to this action. A reasonably jury could well conclude that, if defendant Wehrum was notified of the decedent's condition at approximately 4:30 pm, his failure to take more assertive action was deliberate indifference. Accordingly, defendant Wehrum's motion for sum-

mary judgment, as it relates to the events of June 12, is without merit.

### Defendant Kelly

■ It is undisputed that defendant Kelly had no involvement with the decedent's allegedly unlawful medical care until he collapsed and went into respiratory arrest. According to defendant Kelly, she called the medical director and administered medication pursuant to his instructions, and then performed CPR with defendant Stobart. (Kelly Depo. Tr. at 12, 19). She also tried to clear his airway, but did not attempt to mechanically suction the airway because the machine was stored in a locked room. (Kelly Depo. Tr. at 17).

Plaintiff contends that defendant Kelly failed at the time to adequately ventilate the decedent and failed to clear vomit from decedent's airway. Dr. Newman contends that defendant Kelly should have "placed an airway after respiratory arrest." (Newman Depo. Tr. at 39). However, even he concedes that it was too late:

> In the best of all possible worlds he obviously should have been intubated (i.e., placing an airway). Do I expect a nurse to be able to perform this function? No, I don't. What they should have been able to do is to be able to ventilate him with a bag and mask and at least keep him ventilated adequately until the EMS service got there, and instead what happened was, they didn't clear the airway from his own vomit, they did not apparently ventilate him adequately. To be honest, by this point the game was lost without him being in a facility where they could do that sort of medical intervention. He was not going to survive.
>
> ... If they [defendants Kelly and Stobart] had done everything perfectly ... it's possible he would have had a chance to survive, but it's not a good one.

(Newman Depo. Tr. at 39–40).

Although it is unclear whether defendant Kelly could have adequately ventilated the decedent, it is apparent that she tried. In any event, plaintiff's own expert concedes that there was little if anything defendant Kelly could have done to save the decedent. (Kelly Depo. Tr. at 40). Accordingly, the Court concludes that there is no genuine issue of material fact with respect to defendant Kelly, and she is therefore entitled to judgment as a matter of law.

### Defendant Stobart

■ Plaintiff's claims against defendant Stobart relate primarily to the events of June 12.[3] If defendant Stobart is to be believed, she was for the most part following instructions of defendant Wehrum, whom she contends she called immediately after the decedent arrived at IHS. Under those circumstances, it is difficult to see how defendant Stobart, who worked under the direction of defendant Wehrum, would be liable for improperly or inadequately medicating the decedent. Moreover, it would be of no consequence that she administered another round of bronkosphrine after the decedent had gone into respiratory arrest despite the lack of a doctor's instruction to do so. Defendant Stobart recognized an emergency situation in which time was of the essence, and she did what she thought was necessary to save a life.

On the other hand, if defendant Stobart did not contact defendant Wehrum at approximately 4:30 pm as she said she did, a reasonable jury could well conclude that she was deliberately indifferent to the decedent's serious medical needs. Doctors Rosenberg and Newman agree that steroids had not, but should have been, administered immediately after decedent suffered the initial asthmatic attack. (Newman Depo. Tr. at 27–28). It is apparent that, if such steroids had been administered, the decedent may well have survived. (Newman Depo. Tr. at 30). Moreover, it is reasonable to conclude that a medical professional with defendant Stobart's training as a licensed practical nurse should have realized, based upon a cursory review of the decedent's medical history and the serious nature of an asthmatic attack, that consultation with a medical doctor and/or trans-

---

**3.** Plaintiff does appear to challenge the adequacy of the medical history taken by defendant Stobart when decedent first arrived at RC. However, the Court has already concluded that her conduct in that regard did not reach the level of deliberate indifference.

fer to a hospital was both appropriate and necessary.

Plaintiff also contends that defendant Stobart failed to periodically check decedent's vital signs between the time that he had first arrived at IHS and when he went into respiratory arrest. Defendant Stobart contends that she did. Doctor Newman contends that she did not, and refers to the lack of any supporting notation in the medical records. (Newman Depo. Tr. at 25). Dr. Newman further contends that, if she had checked the vital signs, she would have discovered early on that decedent was having trouble breathing. Dr. Newman, as a medical professional, is experienced in the practice of memorializing medical treatment and is confident that defendant Stobart's failure to record decedent's vital signs reflects her lack of action.

The Court concludes that Dr. Newman's testimony creates a genuine issue of material fact regarding whether defendant Stobart checked decedent's vital signs. Based upon Dr. Newman's testimony, a reasonable jury could certainly conclude that defendant Stobart's failure to periodically check vital signs was deliberately indifferent to the decedent's serious medical needs. Defendant Stobart is therefore not entitled to summary judgment.

### Conclusion

For the foregoing reasons, defendants' motions for summary judgment are **DENIED** in part and **GRANTED** in part as set forth herein. Defendant Kelly is **DISMISSED.** Plaintiff's motion to cancel the settlement conference is **DENIED.**

It is so **ORDERED.**